IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EVAN B. CASEY,

                              Plaintiff,

        v.                                                    OPINION and ORDER

RENEE SCHUELER, ANGIE HODGE, SALAM SYED,                      18-cv-1002-jdp
ELIZABETH LINDNER, FIONA GIBBONS,
NURSE DENISE VALERIUS, and BRYAN GERRY,

                              Defendants.

---

Pro se plaintiff Evan B. Casey is proceeding on claims that prison staff at Columbia Correctional Institution delayed providing him medical treatment for a seizure disorder and wrist injury. Before the court are motions for summary judgment filed by the state defendants (Renee Schueler, Angie Dodge, Salam Syed, Fiona Gibbons, Denise Valerius, and Bryan Gerry), Dkt. 80, and defendant Elizabeth Lindner, a privately employed psychiatric nurse practitioner, Dkt. 86. In considering defendants' motions, I must view the evidence in the light most favorable to Casey. But even with this perspective, Casey has failed to show that any defendant violated his constitutional rights. Defendants' motions will be granted, and this case will be closed.


UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

**A.  The parties**

Plaintiff Evan Casey is a prisoner at Columbia Correctional Institution (CCI). Casey has self-reported psychogenic non-epileptic seizures, which he says are triggered by anxiety. All

defendants worked at CCI during the relevant time period: Salam Syed was a physician at the prison; Renee Schueler was the health services manager; Fiona Gibbons was a nurse clinician; Denise Valerius was the weekend nurse clinician; Angie Hodge was an assistant nursing supervisor; Elizabeth Lindner was a psychiatric advanced nurse practitioner; and Bryan Gerry was a lieutenant.

## B.  Treatment for Casey's seizure condition

Before Casey was incarcerated at CCI, he was housed at New Lisbon Correctional Institution. Casey had a seizure disorder care plan, dated October 2017, that did not prescribe medication, but instead stated that Casey would be monitored for seizures, with a follow-up appointment to be scheduled in six months. Casey took paroxetine for anxiety and diphenhydramine for sleep while housed at New Lisbon. The diphenhydramine was discontinued in January 2018 because Casey was misusing it. The paroxetine was discontinued on February 10, 2018 because Casey was refusing to take it. (Casey says that he did not need the paroxetine anymore because he was not experiencing anxiety at the time.)

On February 25, 2018, Casey was transferred to CCI. Inmates are assigned to a psychiatrist at CCI only if they are taking psychiatric medications or have been referred to psychiatry by a clinician in the psychological services unit. Because Casey was not taking any psychiatric medications when he arrived at CCI, he was not assigned to a psychiatrist. His transfer order stated that he should have a follow-up appointment regarding his seizure disorder in April 2018. Dkt. 84-1, at 14.

On March 8, 2018, Casey had an appointment in the health services unit. Dkt. 84-1, at 32. He requested medications that had not been ordered during intake, and defendant Dr.

2

Syed prescribed calcium carbonate for Casey. *Id.* at 4. (It is not clear from the records whether Casey raised concerns about anxiety or psychogenic seizures at this appointment.)

At some point in early March, Casey began submitting information requests and health services requests stating that he suffered from psychogenic seizures when stressed, that he'd had a couple of seizures since arriving at CCI, and that he needed medication to curb the seizures. He also wrote that he was scared for his well-being. A nurse responded that Casey would be scheduled to be seen by psychiatry. Casey continued to submit health services requests. Defendant Hodge responded to some of them, stating that Casey was scheduled to be seen by a doctor on April 11, 2018, that there was a waiting list for the doctor, and that everyone had to wait their turn.

Casey filed additional health services requests on March 15 and 16, stating that he needed to see a doctor before April 11 because he was having seizures. Casey also submitted a psychological services request, stating that he'd had three seizures that month and that health services staff had refused to help him. He submitted an information request addressed to the health services manager, stating that he'd had a seizure the previous night, that he had informed staff, and that nothing had been done. He stated that no one from health services had come to evaluate him, that he was still nauseated, that he had a headache, that he felt unsafe, and that he did not know what to do. Defendant Valerius responded to Casey's requests, stating that he was scheduled to be seen at nursing sick call on March 18.

On March 18, Casey was seen by a nurse (not a defendant) in the health services unit. He reported having seizures, but he stated that no one had witnessed his seizures and that he had not been injured physically during the seizures. He also stated that he was having anxiety

due to his current living situation. The nurse sent a referral to the psychological services unit for Casey's anxiety. Casey had been referred to psychiatry already.

After his appointment with the nurse, Casey continued to submit health services requests asking to be seen by a doctor who could prescribe medication to him to control his anxiety. He asked whether his appointment with psychiatry could be expedited. He filed health services requests on March 19, 22, 25, and 28. He also continued to file requests with psychological services. Health services staff, including Nurse Valerius, responded that Casey was scheduled to see a doctor.

On March 26, Casey was evaluated by defendant Nurse Gibbons in response to his numerous health services requests. Casey told Gibbons that he had not suffered any physical injuries from his seizures, but that he needed medication now and that he was unhappy that his upcoming appointment with an advanced care provider was not until mid-April. Gibbons told Casey that he did not need medical care for every seizure unless the seizure lasted for more than five minutes or he sustained an injury. She also told him that she would check with an advanced care provider to see if it would be possible to move up the appointment, but that this might not be possible. (Casey also says that Gibbons told him that he would have to wait and that he should have thought before committing crimes.)

On April 5, Casey had a seizure during which he fell and hurt his wrist. (According to Casey, he told defendant Bryan Gerry, a lieutenant, about the seizure and his injured wrist. Gerry does not recall Casey telling him that he'd had a seizure or injured his wrist. Gerry also states that there is no notation of Casey having a seizure or other medical concerns in the unit logbook, where it should have been recorded.) Casey also told a sergeant on the unit about his wrist, and the sergeant told Casey that he reported the injury to defendant Nurse Gibbons.

Later that night, defendant Gibbons was on Casey's unit to provide insulin to another inmate. (Casey says that he yelled to Gibbons that he'd had a seizure, had injured his wrist, was nauseated and dizzy, and had been vomiting. Casey says that Gibbons called him a "drama queen," told him to run his wrist under cold water, and told him to file a health services request. Gibbons says that she does not remember Casey calling to her about his seizure or wrist injury, but that inmates are not supposed to call to medical staff on the housing unit who are seeing other inmates, unless the inmate is experiencing a life-threatening emergency such as chest pain, difficulty breathing, or uncontrolled bleeding. Instead, inmates are supposed to fill out a health services request slip, report the medical need to health services staff performing rounds, or notify security staff.) Casey received a bag of ice for his wrist later that day. (It is not clear who provided the ice to Casey, but Casey wrote in a health services request that he thought it was Gibbons who provided the ice bag to him. Dkt. 84-1, at 83.)

Casey submitted health services requests on April 5 and 6 about his seizure and wrist. Defendant Nurse Valerius responded that Casey was scheduled to be seen by a doctor. On April 11 and 15, Casey filed health services requests asking to be seen by a psychiatrist and a doctor about his seizures and wrist injury. Health services staff responded that Casey was scheduled to be seen and that many prisoners were on a waiting list to see psychiatry and the doctor.

Casey was seen by psychiatrist defendant Dr. Lindner on April 18, 2018. (This appointment was the first time Lindner learned about Casey's anxiety and reported seizures.) Casey told Lindner that his primary concern was to receive medications to treat his anxiety which would, in turn, reduce his psychogenic seizures. Lindner prescribed ziprasidone and trazadone for Casey's anxiety, which he received a few days later. Casey says that he has not

had a psychogenic seizure since starting the anxiety medication. (Casey stopped taking the trazadone in June 2018, so Lindner discontinued it. Dkt. 84-1, at 43.)

## C. Treatment for Casey's wrist

Casey submitted several health services requests dated April 5, 6, 7, 9, and 10, 2018, reporting that he'd had a seizure and was suffering from wrist pain. Defendant Nurse Valerius responded to some of the health services requests, noting that she had scheduled Casey to be seen by the advanced care provider. (Valerius says she did not schedule Casey's appointment as "urgent" because he was not complaining of emergency symptoms, such as chest pain or difficulty breathing.)

While he was waiting for his appointment with the advanced care provider, Casey was seen by Nurse Gibbons on April 11. Gibbons noted that Casey's wrist was not red, swollen, or bruised. Gibbons attempted to manipulate Casey's wrist to check his range of motion, but Casey refused to let Gibbons do so. (Casey says he was afraid Gibbons would hurt him.) Casey was already taking naproxen, an anti-inflammatory pain medication. Gibbons ordered acetaminophen 650 mg four times daily for Casey's reported wrist pain. Casey requested a splint, but Gibbons denied the request because she did not think that a splint was clinically indicated. She referred Casey to the advanced care provider for further assessment. Because Casey did not have any emergent symptoms (deformity, fracture, severe disabling pain, loss of sensation, or joint instability), Gibbons did not make an urgent referral. After Gibbons saw him, Casey filed several more health services requests about his wrist on April 12, 15, 16, 17, and 18.

Casey saw defendant Dr. Syed on April 19, 2018. Syed noted that Casey was following up with the psychiatrist on his complaints of seizures, so Syed focused on Casey's wrist. On

examination, Syed noted that Casey's left wrist had no swelling and had a full range of motion. Casey told Syed that his wrist hurt despite the pain medication. But Syed did not prescribe additional pain medication because Casey already had an active order for naproxen and acetaminophen. Syed ordered a left wrist brace for Casey to provide support, limit his range of motion, and promote healing.

On April 19, Casey filed a health services request complaining that Dr. Syed had not assessed his injury adequately or offered pain medication. Defendant Nurse Valerius responded that Casey currently had naproxen twice a day, and that he would be fitted for a wrist brace that week. Casey filed additional health services requests on April 21 and 22, stating that he was still in pain, that he had not yet received his brace, and that he wanted a follow-up appointment with the doctor. Health services staff responded that he would be seen by a nurse soon about the wrist brace.

On April 25, defendant Nurse Gibbons delivered a wrist brace to Casey. Casey was dissatisfied with the brace. Defendant Dr. Syed had prescribed a wrist brace that had metal in it, but because Casey was housed in the restrictive housing unit and had a history of self-harm, the metal had been removed in compliance with security protocols. Casey did not think the brace would provide support, and he thought that Syed should have prescribed him a different brace.

Casey quickly submitted a health services request complaining of continued wrist pain and dissatisfaction with the wrist brace. Health services staff renewed Casey's order for acetaminophen and also ice, four times daily. Staff also recommended that Casey try rest and elevation, and they directed him to submit another health services request if he had no

improvements after three days. Casey filed more health services requests on April 26, April 29, May 3, and May 5 about his wrist pain.

On May 7, 2018, Casey was seen by defendant Nurse Gibbons in response to another health services request complaining of wrist pain. Gibbons noted that Casey was not presently in pain and that he had a full range of motion, but that he reported pain on exertion. Casey returned the wrist brace to Gibbons, stating that it was not helpful. On examination, Casey's wrist had no apparent abnormalities. Gibbons told him to rest his wrist. Casey's chart was sent to the advanced care provider requesting an order for lidocaine gel. Gibbons told Casey to submit another health services request if he had no improvement in three to four weeks, as soft tissue injuries can take significant time to heal. (A soft tissue injury is an injury such as a strain or bruise to a muscle, tendon, or ligament. Conservative treatment options for soft tissue injuries include rest, ice, elevation, and pain relievers such as ibuprofen or naproxen.)

On May 19, 23, and 30, Casey submitted health services requests stating that his wrist was not better, that he wanted to see a doctor, and that he wanted his order for ice renewed. Staff responded that he was scheduled to be seen. On May 31, Casey cut his arm with a piece of metal and had to get stitches. He was seen by nursing staff and a physician on May 31, June 1, June 4, and June 5, 2018, for his wounds. On June 8, Defendant Nurse Gibbons obtained a verbal order from Dr. Syed for lidocaine gel for Casey's wrist.

On June 1, 6, 8, 10, 15, 21, 26, and 28 and on July 1 and 8, Casey filed health services requests complaining of wrist pain, asking for ice, and asking to be seen by a doctor. Casey was scheduled to see defendant Dr. Syed on June 14 and 28, 2018, but Syed was unable to see Casey because of staff shortages and a flooded cell on Casey's unit. (Inmates such as Casey

who are housed in the restricted housing must be escorted to medical appointments by security staff. When security staff are not available, non-urgent appointments are rescheduled.)

Casey saw Dr. Syed on July 9, 2018. Casey reported that his wrist hurt when he used it or applied pressure to it. On examination, Syed noted that Casey was not in acute distress, that his wrist had no swelling, and that his wrist had a full range of motion and normal grasp. Syed ordered an x-ray of Casey's left wrist and hand. He also ordered that Casey continue taking naproxen, and he referred Casey to physical therapy for a different wrist brace. The results of the x-ray indicated no bone abnormalities and no evidence of acute disease in the left wrist or hand.

Casey submitted additional health services requests about his wrist pain and the lack of treatment on July 14, 17, and 19, 2018. On July 23, Casey saw Dr. Syed again. He told Syed that his left hand hurt when he applied pressure to it, and he asked Syed for ice. Casey also reported that he was not using his brace because it had no metal piece in it and was ineffective. Syed noted that Casey was not in acute distress, that he had no swelling in the left wrist, and that he had a full range of motion and full rotation. Syed noted that he had referred Casey to physical therapy for a different kind of brace. Syed also ordered ice for Casey's wrist for six months.

Casey submitted health services requests about his wrist pain on July 31 and August 2. Case was seen by a nurse (not a defendant) on August 3. The nurse noted that Casey had a normal range of motion and could perform his activities of daily living. The nurse told Casey that his injury might take months to heal. Casey had not yet been scheduled to see physical therapy, and the nurse told Casey that she would follow up with physical therapy scheduling.

Casey filed additional health services requests about his wrist on August 20 and 26, September 4, October 1, 9, 10, 15, 20, and 31, and November 2. On September 5, physical therapy ordered a new wrist brace for Casey. On November 2, 2018, Casey was seen by a nurse (not a defendant), who gave him the new wrist brace and hydrocortisone. (It is not clear whether the new brace was different from the previous brace or whether Casey thought the new brace was helpful.)

Casey continued to file health services requests, filing at least seven between November 3 and 16. Casey now complained that his wrist hurt from the April injury, and that he was suffering from nerve pain in his wrist caused by his self-inflicted wounds. Defendant Nurse Valerius responded that he was scheduled to be seen. On November 20, Casey saw a nurse practitioner (not a defendant) for his continued wrist complaints. The nurse practitioner prescribed Cymbalta for Casey's nerve pain, and she referred Casey to an off-site provider for an electromyography (EMG) and nerve conduction testing for his left wrist pain. (An EMG is a diagnostic procedure to assess the health of muscles and the nerve cells that control them. EMG results can reveal nerve dysfunction, muscle dysfunction, or problems with nerve-to-muscle signal transmission. https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913.) The results of the EMG were negative and showed no signs of nerve damage.

On May 2, 2019, Dr. Roman Kaplan (not a defendant) evaluated Casey's left wrist and noted that he had full range of motion, no signs of carpal tunnel syndrome, normal blood supply, and full strength. Kaplan also reviewed the x-ray and EMG results, and he concluded that there was no need for treatment. (Casey says that Kaplan's notes are false, but he does not elaborate on this assertion or provide any evidence to support it.)

ANALYSIS

Casey was granted leave to proceed on the following Eighth Amendment claims:

1) Defendant Dr. Lindner disregarded health services requests that were forwarded to her regarding Casey's need for anxiety medication to control his seizures;

2) Defendant Dr. Syed delayed seeing Casey and then provided treatment that he knew would be ineffective for treating Casey's wrist injury in April 2018;

3) Defendants Gibbons and Valerius failed to ensure that Casey received adequate treatment for his seizure condition and wrist injury in a timely manner on several occasions between March 2018 and November 2018;

4) Defendant Gerry failed to notify health services about Casey's seizure, injured wrist, nausea, and dizziness on April 5, 2018; and

5) Defendants Hodge and Schueler failed to ensure that health services staff responded to Casey's requests for medical care in a timely and effective manner.

Defendants have moved for summary judgment on all of Casey's claims, arguing that Casey cannot prove that they acted with deliberate indifference to his seizure disorder or wrist injury.

**A. Eighth Amendment standard**

The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement" and to ensure that "reasonable measures" are taken to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994). An inmate may prevail on a claim under the Eighth Amendment by showing that the defendant acted with "deliberate indifference" to a prisoner's serious medical needs or to a substantial risk of serious harm. *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016). A prison official acts with deliberate indifference if the official realizes that a substantial risk of serious harm to a prisoner exists, but the official disregards that risk. *Perez v. Fenoglio*, 792 F.3d 768, 776–77 (7th Cir. 2015). For example, a prison official may violate the Eighth Amendment if the official, having

11

knowledge of a significant risk to inmate health or safety, administers "blatantly inappropriate" medical treatment, *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), acts in a manner contrary to the recommendation of specialists, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011), or inexplicably delays a prisoner's treatment, thereby exacerbating his injury and suffering. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

To survive summary judgment, Casey must present evidence suggesting that he suffered from an objectively serious medical condition and that the defendants knew about the condition but acted with deliberate indifference to it. *Farmer*, 511 U.S. at 834. Defendants appear to accept, at least for the purpose of summary judgment, that Casey's anxiety and psychogenic seizures were serious medical conditions, as neither defendant Lindner nor the state defendants develop any argument to the contrary. But all defendants argue that they did not act with deliberate indifference to Casey's anxiety and seizure disorder. As for Casey's wrist injury, the state defendants argue that Casey's wrist did not present a serious medical condition that required urgent treatment, and that the delays in Casey's treatment did not cause him harm. The state defendants also argue that they did not act with deliberate indifference to Casey's complaints of wrist pain. I address each of these arguments below.

## B. Dr. Lindner

Casey contends that defendant Dr. Lindner acted with deliberate indifference to his psychogenic seizure disorder by ignoring his requests for anxiety medication in March and April 2018. But it is undisputed that Lindner did not receive or review any of Casey's health services requests and that she was not aware of Casey's anxiety or reported seizures until she met with him on April 18, 2018. At that appointment, Lindner prescribed anxiety medication to Casey, which he says resolved his seizures. Lindner did not act with deliberate indifference

12

to Casey's concerns. She responded promptly to Casey's concerns as soon as she was aware of them. Therefore, even assuming that Casey's seizure disorder presented a serious medical need, Lindner is entitled to summary judgment on Casey's claim against her.

## C. Dr. Syed

Casey contends that Dr. Syed acted with deliberate indifference to his wrist injury by delaying Casey's appointments with him and then providing treatment that was ineffective. Because Syed provided Casey with some treatment, the relevant question under the Eighth amendment is whether his actions were "such a substantial departure from accepted professional judgment, practice, or standard," as to demonstrate that Syed "actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–52 (7th Cir. 1996). Casey has not submitted evidence to suggest that Syed failed to use medical judgment in making treatment decisions. (In resolving Casey's claim against Syed, I need not determine whether Casey has presented enough evidence to show that his wrist injury presented a serious medical need at the time Syed treated him, as Casey's claim clearly fails on the second prong of his Eighth Amendment claim.)

Casey complains that he had to wait until April 18 to see Dr. Syed for his April 5 wrist injury. He also complains that in May, June, and July, he had to wait an excessive amount of time to see Syed for follow-up appointments. But the evidence shows that scheduling is done by nursing staff, not Syed. As for the June appointments, the evidence shows that Syed went to Casey's unit for two scheduled appointments in June 2018, but that he was unable to see Casey because of security staff shortages and problems caused by other inmates. Syed cannot be blamed for such circumstances.

Casey also complains that Syed acted with deliberate indifference by failing to properly assess his wrist for a soft-tissue injury, failing to order an effective wrist brace, and failing to prescribe effective pain medication. But Syed has provided a sworn statement saying that the treatment he provided to Casey was appropriate under the circumstances. Dkt. 83, at ¶ 23. At the April appointment, Syed examined Casey's wrist and noted that Casey's wrist had no swelling and had a full range of motion. Syed declined to order additional pain medication because Casey had two types of pain medication already. Syed did order a wrist brace. Casey could not have a brace with metal in it, but Syed thought that a soft wrist brace could still provide support to Casey. Later, in July, Syed ordered lidocaine, ice, and an x-ray for Casey's wrist, even though Syed saw no apparent injury. Syed also referred Casey to physical therapy for a different wrist brace. These actions do not show deliberate indifference.

Casey may have preferred stronger pain medication or a different wrist brace, but his disagreement with Syed's medical judgment is not sufficient to sustain an Eighth Amendment claim. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) (prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards"); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Casey has not submitted evidence showing that Syed's treatment decisions were "blatantly inappropriate" or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). It is true that, in some situations, continuing the same treatment despite no results can constitute indifferent treatment, but Casey has not submitted evidence showing that Syed was withholding another available

treatment option for Casey's wrist pain that would have been more effective and safe for Casey. *See Wilson v. Adams*, 901 F.3d 816, 821–22 (7th Cir. 2018) (prisoner cannot succeed on claim that doctor was prescribing ineffective treatment without evidence that doctor was withholding more effective available treatment). Therefore, Syed is entitled to summary judgment on Casey's claim against him.

## D. Nurses Gibbons and Valerius

Casey contends that defendants Nurse Gibbons and Nurse Valerius acted with deliberate indifference to his serious medical needs by failing to ensure that Casey received timely and effective treatment for his anxiety, seizures, and wrist injury between March 2018 and November 2018.

### 1. Gibbons's and Valerius's responses to Casey's seizure complaints

Casey began requesting treatment for his psychogenic seizures in early March 2018, shortly after he was transferred to CCI. Defendant Valerius responded to some of Casey's March health services requests, informing him that he had been scheduled to see a doctor and psychiatry, and that he also would be seen by a nurse at sick call on March 18. After he was examined by a nurse on March 18, Casey continued to submit health services requests that were reviewed by Valerius. Valerius responded to most of the requests by stating that Casey was scheduled to be seen by a doctor.

Casey argues that Valerius should have done more at this point, in light of Casey's reports of anxiety and seizures. But it is undisputed that Valerius could not prescribe psychiatric medication to Casey and that Casey had been referred to both psychology and psychiatry for his complaints of anxiety and requests for medication. Casey argues that Valerius should have acted to expedite his appointments, by labeling them as "urgent" or "emergent."

15

But Casey has not submitted evidence showing that his condition was urgent in March 2018, or that he should have been given priority over the many other inmates on the list to see the psychiatrist. Nor has Casey shown that Valerius thought that his condition was urgent. *See LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) (prison official does not act with deliberate indifference unless the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and the official "draw[s] that inference").

Casey has not shown that his anxiety and self-reported psychogenic seizures would have been obvious to Valerius. Casey's transfer file from New Lisbon showed that Casey was not taking any psychiatric medication, that he had reported feeling fine without medication just a few weeks before, that he had not been taking medication specifically for seizures for more than a year, and that his seizure plan recommended that he be seen for a follow-up appointment in April 2018. In addition, although Casey reported that he was having seizures at CCI, he wrote in his health services requests and reported to a nurse at the March 18 appointment that he had suffered no physical injuries from his seizures. Under these circumstances, Valerius's decision not to schedule Casey for an urgent appointment does not constitute deliberate indifference.

Defendant Gibbons's first involvement with Casey was on March 26, when Gibbons evaluated Casey in response to his numerous health services requests about his anxiety and seizures. Casey told Gibbons that he had not suffered any physical injuries from his seizures, but that he needed medication to control his anxiety. Gibbons told Casey that he did not need medical care for every seizure unless the seizure lasted for more than five minutes or he suffered an injury. She also told Casey that moving up his appointment might not be possible, but that she would check. According to Casey, Gibbons also told him that he should have thought before

16

committing crimes. But none of these facts show that Gibbons acted with deliberate indifference to Casey's complaints of seizures. Gibbons did not think that Casey needed urgent treatment for his reported seizures, as Casey had not reported any long-lasting seizures and had not been injured. Gibbons knew that Casey was scheduled to see a psychiatrist within the next few weeks, and that in the meantime, Casey could be monitored by security staff and health services. Casey has not shown that Gibbons's evaluation of Casey's medical needs was blatantly inappropriate or not based on medical judgment. For example, Casey has not shown that nursing staff's refusal to designate Casey's appointment as urgent departed so radically from the standard of care for patients complaining of anxiety-induced psychogenic seizures that a jury could infer that nursing staff was failing to use medical judgment.

Valerius again reviewed health services requests from Casey in early April, in which he stated that he'd had a seizure, had been injured, and needed to see a psychiatrist. Valerius responded to those requests by stating that Casey was scheduled to be seen soon, and other nurses responded that many inmates were on a waiting list to see psychiatry. These responses were reasonable, as Casey was scheduled to be seen in the next week, and he was seen by psychiatry on April 18. For all of these reasons, no reasonable jury could conclude that either Valerius or Gibbons acted with deliberate indifference to Casey's requests for psychiatric medication and seizure complaints. Therefore, Valerius and Gibbons are entitled to summary judgment on Casey's claims against them based on their responses to his requests for psychiatric treatment.

### 2. Gibbons's and Valerius's responses to Casey's wrist complaints

Casey also contends that Gibbons and Valerius acted with deliberate indifference in response to his numerous complaints about wrist pain. Casey says that he first reported his

wrist pain to Gibbons on April 5, the same day that he was injured. Gibbons was on Casey's unit to deliver insulin to another inmate, and Casey yelled to her that he'd had a seizure and hurt his wrist. Casey says that Gibbons told him that he was a "drama queen," that he should run his wrist under cold water, and that he should submit a health services request.

Although Gibbons's alleged response was unprofessional, it was not unconstitutional. A single callous comment, by itself, is not sufficient to support an Eighth Amendment claim. *See Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019) (Eighth Amendment prohibits medical staff from intentionally causing "psychological anguish" through verbal harassment, but the constitution does not demand "genteel language and good manners"). To prove deliberate indifference, Casey would have to show that Gibbons knew her statements would cause psychological trauma to Casey, or that Gibbons's treatment decision was blatantly inappropriate. He has failed to do so. It is undisputed that Casey did not have emergent symptoms when he called to Gibbons. His wrist was not deformed, obviously fractured, without sensation, or unstable. Without urgent or emergent symptoms, it was against prison policy for Casey to call out to Gibbons while she was assisting another inmate, and it was reasonable for Gibbons to instruct Casey to submit a health services request.

Casey followed Gibbons's instructions, and he submitted several health services requests over the next few days. Defendant Nurse Valerius responded to some of the health services requests, noting that she had scheduled Casey to be seen by the advanced care provider. And Gibbons examined Casey's wrist on April 11. Casey argues that Valerius and Gibbons acted with deliberate indifference by failing to examine him sooner, by failing to schedule an "urgent" appointment with an advanced care provider, and by failing to ensure that he received timely

18

follow-up appointments in response to the health services requests he filed throughout the summer and fall 2018.

Delaying treatment, even if the medical condition is not life threatening, can be evidence of deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016); *Perez*, 792 F.3d at 777–78. But delays can also be reasonable. *Petties*, 836 F.3d at 730 (noting that delays are common in prison and that the length of the delay, seriousness of the condition, and ease of providing treatment must be considered when evaluating whether a delay is "tolerable"). A needless delay in providing medical treatment may violate the Eighth Amendment if the delay exacerbated the inmate's injury or prolonged his pain unnecessarily. *Id.* at 730–31; *McGowan*, 612 F.3d at 640. Casey argues that Gibbons's and Valerius's delays in scheduling appointments for his wrist injury caused him to suffer in pain unnecessarily, but he has submitted no evidence to support his argument.

First, Casey has not shown that his wrist injury presented a serious medical need that required treatment beyond rest and pain medication, which Casey had access to already. An x-ray showed no injury, and neither doctor who examined Casey's wrist diagnosed a serious injury. In response to Casey's subjective complaints, Dr. Syed prescribed a soft wrist brace, which Casey did not use, ice, which Casey had received from nursing staff already, and lidocaine gel. Syed noted that Casey's wrist had no apparent abnormalities, no swelling, and a full range of motion. Dr. Kaplan found no evidence of a wrist injury at all, and he recommended no treatment. In sum, although a jury could accept Casey's statements that his wrist hurt, a jury would have no basis to conclude that Casey's wrist injury was a "serious" medical condition.

Second, even if Casey's wrist injury qualified as a serious medical condition, Casey has not shown that either Valerius or Gibbons thought that Casey's wrist injury presented a serious medical need. Casey's need for medical treatment was not so obvious that Valerius and Gibbons would have drawn the inference that he had a serious medical need. Casey did not describe emergent symptoms in his health services requests, such as deformity, fracture, severe disabling pain, joint instability, or loss of sensation. When Gibbons examined Casey's wrist on April 11, Casey's wrist had no obvious symptoms. The wrist was not red, swollen, or bruised. Gibbons ordered acetaminophen 650 mg four times daily and referred Casey to an advanced care provider for further assessment, but Gibbons did not think a brace was clinically indicated.

Third, Casey has not shown that the delay in treatment exacerbated his injury or caused him needless pain. *See Wilson*, 901 F.3d at 822 (plaintiff's Eighth Amendment claim based on delay in treatment failed because he was unable to identify any evidence of exacerbation of his injury caused by the delay); *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (explaining that an Eighth Amendment claim based on delay will fail "unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay"). While he was waiting for treatment, Casey had both pain medication and ice, at least for some of the time. Dr. Syed and health services staff ultimately recommended that Casey treat his wrist through rest, ice, elevation, and pain relievers. Casey has not shown that the delay in treatment worsened his wrist injury or caused him needless pain.

Fourth, after Casey saw Dr. Syed, Valerius and Gibbons were entitled to rely on Syed's medical judgment and treatment decisions. Syed examined Casey's wrist and ordered conservative treatment in April and July, 2018, but Casey began complaining about Syed's treatment decisions almost immediately after they were implemented. As nurses, Valerius and

20

Gibbons had no authority to overrule Syed's treatment decisions, and also, no reason to think that Syed's treatment decisions were obviously inappropriate.

For all of these reasons, Casey has failed to show that Valerius or Gibbons acted with deliberate indifference to his wrist injury. Therefore, they are entitled to summary judgment on Casey's claims against them.

## E.  Lt. Gerry

Casey contends that defendant Lt. Gerry acted with deliberate indifference by failing to notify health services about Casey's seizure and wrist injury on April 5, 2018. Gerry has no recollection of Casey reporting a seizure or injury to him on April 5. But I must accept Casey's version of events as true for purposes of summary judgment. Even so, Casey's claim against Gerry fails for two reasons.

First, according to Casey's own version of events, health services staff was aware of his seizure and wrist injury on April 5 because: (1) Casey reported the injury to a sergeant who told Gibbons about it; (2) Casey reported his injury to Nurse Gibbons directly; and (3) Casey filed a health services request on April 5. So Gerry's alleged failure to report Casey's injury to health services had no significant impact on health services staff's determination of the urgency of Casey's medical need.

Second, as discussed above, Casey has not shown that he needed urgent treatment for his wrist injury on April 5. He had no emergent symptoms and he had access to pain medication already. He also received ice. So any delay in Casey's receiving treatment caused by Gerry's alleged failure to report his injuries was insignificant and does not support a constitutional claim. *See Petties*, 836 F.3d at 730–31 (a delay in treatment violates the Eighth Amendment only if the delay exacerbated the inmate's injury or prolonged his pain unnecessarily).

### F. Nurses Hodge and Schueler

Finally, Casey contends that defendants Hodge and Schueler violated his Eighth Amendment rights by failing to ensure that health services staff responded to Casey's requests for medical care in a timely and effective manner. Hodge and Schueler had supervisory roles in the health services unit at CCI, and they did not usually treat patients directly or make treatment decisions. But supervisory defendants can be liable under § 1983 if they were "personally responsible for the deprivation of the constitutional right," *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001), meaning that they knew about unconstitutional conduct and facilitated it, approved it, condoned it, or ignored it. *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).

Casey has shown that he submitted several information requests to Schueler and Hodge regarding nursing staff's failure to provide him adequate medical care for his anxiety, seizures, and wrist pain. He also has shown that neither Schueler nor Hodge took steps to expedite his appointments or modify the care that had been ordered by nursing staff or Dr. Syed. But this is not enough to support a constitutional claim against Schueler or Hodge because, as discussed above, Casey has failed to show that the treatment provided by nursing staff or Syed was blatantly inappropriate. Schueler and Hodge had no constitutional duty to intervene in care decisions that appeared to be reasonable based on medical staff's assessment of Casey's medical needs and the needs of other inmates. Accordingly, Schueler and Hodge are entitled to summary judgment on Casey's claims against them.

22

ORDER

IT IS ORDERED that:

1.  The motion for summary judgment filed by defendants Bryan Gerry, Fiona Gibbons, Angie Hodge, Renee Schueler, Salam Syed, and Denise Valerius, Dkt. 80, is GRANTED.

2.  Defendant Elizabeth Linder's motion for summary judgment, Dkt. 86, is GRANTED.

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered October 15, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

23